IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

AUG 2 2007

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

JAMES A. LUCAS,

        Petitioner,

v.                                    Civil Action No. 2:05cv61
                                    (Judge Maxwell)

THOMAS MCBRIDE, Warden,

        Respondent.

## OPINION/REPORT AND RECOMMENDATION

On August 9, 2005, the *pro se* petitioner filed an Application for Writ of Federal Habeas Corpus by a Person in State Custody. On September 13, 2005, the petitioner filed a supplement to his petition. After payment of the required filing fee, the undersigned conducted a preliminary review of the file and determined that summary dismissal was not warranted at that time. Accordingly, the respondent was directed to show cause why the petition should not be granted.

On October 13, 2005, the respondent filed a Motion to Dismiss the Petition as Successive. On March 7, 2006, the undersigned issued an Opinion/Report and Recommendation in which it was recommended that the respondent's motion be denied. That opinion was adopted by the Honorable Robert E. Maxwell on September 25, 2006. Consequently, the respondent was directed to file a response on the merits of the petitioner's claims.

On November 20, 2006, the respondent filed an answer to the petition in which he generally denies that any violation of the petitioner's rights has occurred. In addition, the respondent also filed a Motion to Dismiss and a Motion for Summary Judgment.

On March 9, 2007, the petitioner filed an Objection to State's Motion to Dismiss and Motion

for Summary Judgment and Petitioner's Motion for Investigator.

This case is before the undersigned for a Report and Recommendation on the pending motions.

## I. Procedural History

### A. Petitioner's Conviction and Sentence

In October 1999, the petitioner was indicted by the Circuit Court of Marion County, West Virginia, of two counts First Degree Sexual Assault of a person less than 11 years old in violation of W.Va. Code §61-8B-3, two counts Sexual Abuse by a Parent, Guardian or Custodian in violation of W.Va. Code § 61-8D-5(a), and two counts Incest in violation of W.Va. Code § 61-8-12.[1] See Respondent's Exhibit 1 (dckt. 32-2) (hereinafter "Resp. Ex. 1"). The petitioner pled not guilty and attorney Scott Shough was appointed to represent him. Resp. Ex. 12 at 2. The case against the petitioner proceed to trial on April 11, 2000. Id.; Resp. Ex. 34. However, upon the petitioner's motion, a mistrial was declared and a new trial was ordered. Id. A short time later, the court granted a motion for change of venue and the case was moved to Morgan County, West Virginia. Id.; Resp. Ex. 38.

On July 27, 2000, Mr. Shough filed a motion requesting permission to withdraw as counsel. Resp. Ex. 34 at 2; Resp. Ex. 35. In the motion, Mr. Shough asserted that the petitioner was not satisfied with his defense strategy and that the petitioner would not cooperate in his defense if Mr. Shough was not removed. Id. In addition, Mr. Shough asserted that the petitioner was not happy with his representation thus far and that irreconcilable differences existed between himself and the

---

[1] The alleged victim was the petitioner's stepdaughter, who because of her age at the time (4 years old), and the nature of these proceedings, will be referred to herein by her initials, G.V.

petitioner. Id. Therefore, Mr. Shough felt that he could no longer effectively represent the petitioner and requested permission to withdraw as counsel. Id. On August 2, 2000, Mr. Shough's motion was granted and he was relieved of all further responsibility in the case. Resp. Ex. 35. However, prior to granting Mr. Shough's motion, the Court informed the petitioner that his trial date would not change and voiced concern over the period of time in which new counsel would have to prepare the case for trial. Id. at 21-22. Thus, the trial court required the petitioner to waive any problems that may occur due to the change in counsel at such a late stage of the case. Id. at 22. Petitioner accepted such waiver against "his better judgment." Id. at 22. G. Patrick Stanton was subsequently appointed as petitioner's new counsel. Resp. Ex. 12 at 3.

On August 9, 2000, Mr. Stanton filed a motion for a continuance of the petitioner's September trial date. Id. The trial court held a hearing on the motion at which Mr. Stanton explained that since accepting the petitioner's case, several other matter have come up, including two federal appointments. Resp. Ex. 36 at 2. Mr. Stanton further explained that in one of those federal cases, a trial was scheduled for the 7th of September and that the other federal case was likely to be set for trial in early October. Id. Additionally, Mr. Stanton stated that he would also be working on an interlocutory appeal in one of those cases. Id. at 3. Because he had only just started to go through the petitioner's file, and had only just received the transcripts from the petitioner's first trial, Mr. Stanton requested that the petitioner's case be continued until the next term. Id. at 2-3.

The trial judge, however, stated that the petitioner's case would proceed as scheduled and that if Mr. Stanton did not feel he could effectively represent the petitioner in light of his other commitments, the court would entertain a motion to withdraw. Id. at 3. Mr. Stanton stated that such was the case, but that if the Court were to order him to continue to trial on the set date, he would do

his very best. Id. at 4-5. The Court construed this request as a motion to withdraw and granted the request.[2] Resp. Ex. 12 at 3.

On August 31, 2000, the Court appointed Eric Wildman to represent the petitioner. Id. Mr. Wildman also filed a motion for continuance. Id. The trial court held a hearing on the motion at which Mr. Wildman argued that issues had arisen during his preparation of the petitioner's case which cannot be addressed within the time frame set by the Court. Resp. Ex. 37 at 4. At that time, there were approximately three weeks left before the petitioner's trial. Id. at 5. The trial court, however, held fast and denied the motion. Id. at 6. In denying the petitioner's motion, the trial court addressed the relevant factors for assessing claims of inadequate time to prepare[3] and found that those factors did not weigh in favor of granting a continuance. Id. at 6-10.

Petitioner's retrial commenced on September 26, 2000. Resp. Ex. 12 at 3; Resp. Ex. 38. On

---

[2] Although the petitioner argues repeatedly that Mr. Stanton never requested to withdraw, the undersigned disagrees. The transcripts of that hearing show that Mr. Stanton's intent was to secure a continuance of the petitioner's case. Resp. Ex. 36. However, when that was not permitted by the trial judge, Mr. Stanton was given the option of withdrawing in light of his other commitments. Id. at 3. Mr. Stanton accepted the Court's invitation to request withdraw. Id. Specifically, the following exchange occurred:

> The Court: If you're telling me that you can't handle this case because of other previous commitments-- being federal commitments -- I have no problem if you want to withdraw so I can appoint other counsel who may not be able to --
> Mr. Stanton: I believe, Your Honor, that that's the case.

Id. Mr. Stanton was not forced to withdraw, nor was he coerced as the petitioner suggests. The trial court merely gave him the option of withdrawing when his motion for a continuance was denied. Therefore, although the petitioner is correct in that no formal motion to withdraw was ever filed, Mr. Stanton did indeed, request permission to withdraw.

[3] The factors that the trial court considered were: (1) the time available for preparation; (2) the likelihood of prejudice from the denial; (3) the accused's role in shortening the effective preparation time; (4) the degree of complexity of the case; (5) the availability of discovery from the prosecution; (6) the adequacy of the defense provided at trial; (7) the skill and experience of the attorney; (8) any pre-appointment or pre-retention experience of the attorney with the accused for the alleged crime; (9) any representation of the defendant by other attorneys that accrues to the defendant's benefit; (10) whether the plea for more time to prepare for trial is made in good faith; (11) the public interest in a speedy trial of the case; and (12) the time the defendant has been in jail awaiting trial. Resp. Ex. 37 at 6-10.

September 28, 2000, the jury returned a verdict of guilty on all six counts. Id. On November 27, 2000, the petitioner was sentenced to 15-35 years on Counts One and Two, 5-15 years on Count Three, 10-20 years on Count Four, and 5-15 years on Counts Five and Six. Resp. Ex. 29. All sentences to run consecutively for a total sentence of 55-135 years. Id.

## B.  Direct Appeal

On June 7, 2001, the petitioner appealed his conviction and sentence to the West Virginia Supreme Court of Appeals ("WVSCA"). Resp. Ex. 4. The petitioner asserted the following grounds on appeal:

(1) The Circuit Court erred in permitting the State of West Virginia to introduce collateral evidence of the defendant's prior wrongful acts pursuant to Rule 404(b) of the West Virginia Rules of Evidence;

(2) The trial court erred in denying the defendant's request for an instruction for third degree sexual abuse, a misdemeanor, and lessor included offense of first degree sexual assault.

(3) The trial court erred by denying defense counsel's motion for a continuance thereby denying the defendant effective representation of counsel due to counsel's stated inability to adequately prepare in the time frame allotted by the court.

(4) The trial court erred by denying the defendant the use of a qualified expert to aid the defendant in preparation and/or evaluation of the infant victim.

(5) The trial court erred by denying the defendant's motion to set aside the verdict as being against the weight of the evidence and motion for a new trial.

(6) The cumulative effect of error caused defendant's due process and ability to obtain a fair trial to be violated.

(7) The trial court erred by not allowing cross examination of the victim's statements.

Id.

Petitioner's direct appeal was refused on November 5, 2001. Id.

## C. **Petitioner's State Habeas Petition**

The petitioner filed a state habeas petition with the Circuit Court of Marion County on March 26, 2001. Resp. Ex. 5. In his state habeas petition, the petitioner asserted the following grounds for relief:

(1) Outrageous governmental conduct;

(2) Judicial misconduct;

(3) Claims of bias on the part of the trial judge;

(4) Claims of prejudicial statements by trial judge;

(5) Prosecutorial misconduct;

(6) Ineffective assistance of trial and appellate counsel;

(7) Failure to abide by Court granted discovery request and withholding exculpatory and impeachment evidence;

(8) Defective jury instructions;

(9) Lessor included offense instruction;

(10) Improper remarks by prosecutor;

(11) Right to confrontation;

(12) Defects in indictment;

(13) Trial court lacked jurisdiction;

(14) Refusal to grant continuance;

(15) Violation of rules of evidence 404(b); and

(16) Denial of qualified expert.

Id.

The state court held omnibus evidentiary hearings on January 4, 2004, and March 4, 2004.

Resp. Ex. 40 and 41. On June 8, 2004, the petitioner's state habeas petition was denied. Resp. Ex.

12. Petitioner filed an appeal of that decision to the WVSCA on July 19, 2004. Resp. Ex. 13. The

WVSCA refused the petitioner's appeal on March 15, 2005. Id.

## D. Petitioner's Federal Habeas Petition

In his federal habeas petition, the petitioner asserts the following grounds for relief:

(1) Lack of Jurisdiction;

(2) Claims of judicial bias;

(3) Prosecutor misconduct;

(4) Ineffective assistance of trial and appellate counsel;

(5) Denial of discovery/withholding of exculpatory evidence;

(6) Defective jury instructions;

(7) Improper opening and closing remarks;

(8) Right to confront all witnesses;

(9) Lessor included offense instruction;

(10) Violation of Rules of Evidence 404(b);

(11) Refusal to grant continuance;

(12) Denial of expert assistance; and

(13) Verdict unsupported by the evidence.

## E. Respondents' Contentions

The respondent denies that any violation of the petitioner's rights has occurred. Moreover, in support of his motion to dismiss, the respondent asserts that federal relief is available only for claims of constitutional dimension. Therefore, to the extent that the petitioner's claims allege violations of state law, the respondent argues that those claims are not cognizable on federal habeas review. In support of his motion for summary judgment, the respondent asserts that there are no genuine issues of material fact with respect to the claims raised in the petition and that the respondent is entitled to judgment as a matter of law.

## II. Standards of Review

## A. Motion to Dismiss

In ruling on a motion to dismiss the Court must accept as true all well-pleaded factual allegations. Walker v. True, 399 F. 3d 315 (4th Cir. 2005). Furthermore, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear, as a matter of law, that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S.41, 45-46 (1957). Additionally, a district court should construe pro se petitions liberally. See Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (emphasizing the liberal construction rule for pro se complaints raising civil rights issues).

## B. Summary Judgment

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment

motions in habeas cases. See Blackledge v. Allison, 431 U.S. 63, 80 (1977). So too has the Fourth Circuit Court of Appeals. Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party. Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). However, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir 1987). Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create fair doubt rather then encourage mere speculation. Anderson, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587-588 (1986).

## C. Federal Habeas Review Under 28 U.S.C. § 2254

Notwithstanding the standards which govern the granting of a motion for summary judgment, the provisions of 28 U.S.C. § 2254 must be examined to determine whether habeas relief is proper.

Title 28 U.S.C. § 2254 requires a district court to entertain a petition for habeas corpus relief from a prisoner in State custody, but "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Regardless, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). However, the federal court may not grant habeas relief unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1) and (2); see also Williams v. Taylor, 529 U.S. 362 (2000).

The Fourth Circuit Court of Appeals has determined that "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." Thomas v. Taylor, 170 F.3d 466, 475 (4th Cir. 1999). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. Bell v. Jarvis, 236 F.3d 149 (4th Cir.) cert. denied, 524 U.S. 830 (2001)(quoting Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000)). However, the court must still "confine [it's] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id. at 158.

A federal habeas court may grant relief under the "contrary to" clause "if the state court

arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently that this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A federal court may grant a habeas writ under the "unreasonable application" clause, "if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. "An unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410.

When a petitioner challenges the factual determination made by a state court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the facts.'" 28 U.S. C. § 2254(d)(2). In reviewing a state court's ruling on post-conviction relief, "we are mindful that 'a determination on a factual issue made by a State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003).

However, habeas corpus relief is not warranted unless the constitutional trial error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Richmond v. Polk, 375 F.3d 309 (4th Cir. 2004). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, supra.

Here, the petitioner's claims were properly presented to the courts of the State. Because the petitioner's claims were adjudicated on the merits in State court, the State's findings of fact and conclusions of law are due the appropriate deference.

## III. Analysis

Although *pro se* petitions are to be liberally construed as set forth in <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), habeas petitions must meet heightened pleading requirements. <u>McFarland v. Scott</u>, 512 U.S. 849 (1994). "[N]otice pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error." <u>Blackledge v. Allison</u>, 431 U.S. 63, 75, n. 7 (1977) (internal quotations omitted). A habeas petitioner must come forth with evidence that a claim has merit. <u>Nickerson v. Lee</u>, 971 F. 2d 1125, 1136 (4th Cir. 1992), <u>cert. denied</u>, 507 U.S. 923 (1993). Unsupported, conclusory allegations do not entitle a habeas petitioner to relief. <u>Id.</u>

## A. Ground One - Defective Indictment

In this ground, the petitioner asserts that in West Virginia, a valid indictment is a jurisdictional prerequisite to a valid conviction. Petition at 13. Moreover, the petitioner argues that an indictment obtained entirely through false testimony is invalid. <u>Id.</u> at 11. Therefore, the petitioner asserts that his indictment, brought solely on the perjurious and false testimony of Detective Doris James, is invalid and deprived the State of jurisdiction to prosecute him. <u>Id.</u> at 14.

In support of his claim, the petitioner asserts that Detective James was the only witness to testify at his grand jury proceedings. After testifying as to how the Marion County Sheriff's Department became involved in this case, Detective James relayed to the grand jury that G.V. told her and a caseworker from the Department of Health and Human Resources ("DHHR") that the petitioner "placed her on top of him, as she was naked, he would unzip his pants." Resp. Ex. 21 (Grand Jury Minutes) at 3. Detective James also testified that G.V. had undergone several hours of psychological assessment and was found to have inappropriate knowledge of sexual behavior and was able to describe sexual activity at an inappropriate level. <u>Id.</u> Detective James further testified

that G.V. had described the petitioner's penis as "being red and hanging down and then it would stand up and gooky skin would come out of it." Id. The detective testified that she believed the child's reference to "gooky skin" was a reference to an uncircumcised penis and that the petitioner had told her that he had not been circumcised. Id.

Detective James also testified that G.V. recalled at least two incidents, one at a green house in which she lived, and one at a white house in which she lived. Id. at 4. Detective James asserted that both houses are located in Marion County West Virginia. Id. Detective James further testified that G.V. was less than 11 years old, that the petitioner was her stepfather and that the two were not married. Id.

After her direct testimony, members of the grand jury were invited to ask Detective James questions. Id. at 5. Although the petitioner identifies several areas in which he believes Detective James' grand jury testimony is inconsistent with later testimony, the crux of his perjury argument appears to be the following exchange between a grand jury member and the detective:

> **Grand Juror:** Did you have any kind of medical tests done on the girl to verify?
> **Detective James:** Yes.
> **Grand Jury:** So she's not making up some kind of --
> **Detective James:** No, she's not making up a story. No, she is not.

Id.

At the first omnibus evidentiary hearing, the petitioner first verified that Detective James was testifying under oath. Resp. Ex. 40 at 9. He then questioned her regarding her experience testifying under oath before grand juries and in trial settings. Id. Detective James subsequently stated that she takes an oath seriously and that she told the truth at all times relevant to this case. Id. at 9, 18. The petitioner then questioned Detective James extensively about her inconsistent and allegedly perjurious testimony. Id. at 6-34. As to the above-mentioned exchange, the petitioner questioned

Detective James as follows:

> **Q:** Detective, on page 5, you were asked: Did you have any kind of medical tests done on the girl to verify?
> You replied, Yes.
> Do you recall that testimony?
> **A.** I do . . .
> **Q.** And was that testimony accurate?
> **A.** To the best of my knowledge and belief, the child was taken to the Manchin Clinic.
> **Q.** Detective, the examination isn't -- answer the question detective. The question was: Did you have any kind of medical verification of molestation on the child?
> **A.** Medical verification? I don't recall.
> **Q.** Did you have any medical tests done on the girl to verify?
> And you answered, Yes.
> What kind of verification did you have, Detective? Because that's what that grand jury made their mind up to bring down the indictment on first degree sexual assault.
> There wasn't anything else you told them that would have made them bring down an indictment on first degree sexual assault.[4] You told them you had medical verification of molestation. And I'm asking you: What verification did you have?
> **A.** I thought I had been asked: Was the child seen by a physician or something of that nature, and I knew that the child had been to Manchin Clinic . . .
> **Q.** Well, you were given a second chance to clear that up. When the same grand juror asked: So she's not making up a story?
> And you said, No, she's not making up a story. Do you recall . . .
> **A.** I don't recall exact questions from the grand jury, no, I don't.

Id. at 26-28.

The state habeas court then attempted to clarify the petitioner's questions by asking Detective James whether or not the child's medical examination at Manchin Clinic revealed any evidence that was consistent with the child's story. Id. at 29. The detective stated that she did not recall. Id.

With respect to this claim, the State habeas court found that "[a]lthough petitioner obviously disagrees with the testimony of Detective James, petitioner has offered no credible evidence that Detective James' grand jury testimony was untruthful." Resp. Ex. 12 at 10.

---

[4] The Court notes that the petitioner cannot possibly know what information the grand jury relied on to bring down the indictment or the weight the grand jury gave to this particular testimony.

Upon an independent review of the record, the undersigned finds that the state court's adjudication of the petitioner's claim that the testimony of Detective Doris James was perjurious and deprived the state court of jurisdiction to prosecute him was not contrary to clearly established federal law. See Wilson v. Lindler, 8 F.3d 173 (4th Cir. 1993) (en banc), cert. denied, 510 U.S. 1131 (1994) (citing Hurtado v. California, 110 U.S. 516, 534-45 (1884)) (the right to a grand jury has not been applied to the States via the Fourteenth Amendment). Additionally, in light of the evidence presented in the state court proceedings, the undersigned does not believe that the state court's adjudication of the petitioner's claims involved an unreasonable application of clearly established federal law, nor do the state court's findings result in a decision that is based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The evidence presented showed that Detective James was well aware of the importance of swearing an oath to the Court. Morever, the evidence showed that she believed her testimony was truthful and accurate. At best, the petitioner has shown that Detective James misunderstood the question asked by the grand juror. Without more, there is simply no evidence that her testimony is perjurious.[5]

Also in this ground, the petitioner contends that the indictment was defective because it was not found by the full grand jury. Petition at 26. In support of this claim, the petitioner asserts that the original charge to the grand jury was for sexual *abuse* in the first degree, not sexual assault. Id.

---

[5] Under West Virginia law, a witness who willfully testifies falsely regarding a material matter before a grand jury considering a felony indictment is guilty of perjury. W.Va. Code 61-5-1(a); see also U.S. v. Dunnigan, 507 U.S. 87, 94 (1993) (wherein the United States Supreme Court defined perjury as "giving false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory"). Moreover, the intent to lie is an essential element of perjury. See State v. Rohm, 156 S.E. 69 (W.Va. 1930). Petitioner has provided no evidence that Detective James had the requisite intent to commit perjury. The detective, on the other hand, has testified that to the extent her testimony at the grand jury proceedings was inaccurate, such inaccuracy was merely the result of confusion or mistake.

at 28. Further, the petitioner contends that after the grand jury brought the indictment on sexual abuse, the prosecution changed the charge to sexual assault and gave it to the foreperson to sign. Id. Therefore, the petitioner asserts that the full grand jury only considered the charge of sexual abuse and not the charge of sexual assault. Id.

This claim is without merit. The petitioner provides no evidence to support his contention that the grand jury charge was for anything other than sexually assault. Nor has the petitioner provided any evidence to show that the grand jury foreman signed an amended document.

## B. Ground Two - Claims of Judicial Bias

In this ground, the petitioner asserts that his right to a fair trial was violated by several instances of judicial bias. The petitioner asserts 15 specific instances in support of his claims. They are:

(1) the court's release of his second attorney was vindictive and in retaliation for the petitioner's releasing of his first counsel;[6]

(2) the trial court abused its discretion and violated his right to be represented at every stage of the proceedings when it required him to waive any problems that may come up as a result of releasing his first attorney;

(3) the court's rapid reading or speed reading of the jury instructions prejudiced the case by confusing the jury;

(4) the trial judge abused his discretion by denying the petitioner's motion for recusal by failing to address the allegations of bias and following the Canon 3(E)(1) of the Code of Judicial

---

[6] There was nothing vindictive or improper about the Court's release of Mr. Stanton. See n. 2, infra.

Conduct;

(5) the trial court erred when it refused to address the issue of the police detective's false testimony in front of the grand jury and instead citing "reasons apparent on the record;"

(6) the trial court erred when it failed to declare a mistrial on the second day of trial when it was notified that the petitioner intended to question his own witnesses;

(7) the trial court abused its discretion during the mistrial in April 2000 when the trial court accepted the explanation of Detective James for her missing notes;[7]

(8) the trial court erred by failing to respond effectively to claims that the State prosecutor's office failed to appropriately provide the defense with court ordered discovery;

(9) the petitioner's right to a fair trial was violated when the trial court erred in denying the defense funds to employ an expert witness;

(10) the trial court abused its discretion by improperly allowing testimony by the State's experts to establish the alleged victim's credibility;

(11) the trial court abused its discretion by allowing and/or encouraging hearsay testimony to be used against the petitioner;

(12) the trial court abused its discretion when it allowed the petitioner to represent himself at trial without an appropriate inquiry;

(13) the petitioner's right to a fair trial was violated when the trial judge denied him the right to fully cross-examine a key witness;

(14) the trial court abused its discretion by openly assisting the State in the prosecution of

---

[7] The court notes that any alleged errors at the petitioner's first trial in April 2000 could not have prejudiced him as that trial ended in a mistrial.

its case by sustaining objections that were never made; and

(15) the trial judge made biased comments.[8]

With regard to his claims of judicial bias, the state habeas court found that "the remaining grounds asserted by Mr. Lucas are wholly without merit and the Court will not address each of them individually. Further, the remainder of the grounds asserted by Mr. Lucas are, in this Court's opinion, an attempt to re-litigate the facts of the entire trial, not claims alleging violations of a constitutional dimension." Resp. Ex. 12 at 14.

Although the petitioner terms this ground as raising issues of judicial bias, the petitioner does not actually state any grounds of judicial bias. Instead, the petitioner cites numerous instances in which, in his opinion, the court either erred or abused its discretion in making legal rulings. As properly noted by the state court, these issues are an attempt to re-litigate the legal decisions made by the trial judge and fail to rise to the level of constitutional dimension. To the extent that the petitioner asserts that these decisions prejudiced his right to a fair trial, the undersigned, having carefully read the trial transcripts, can find no prejudice to the defendant.

Accordingly, upon an independent review of the record, the undersigned finds that the state court's adjudication of the petitioner's claims of judicial bias was not contrary to clearly established federal law. Additionally, in light of the evidence presented in the state court proceedings, the undersigned does not believe that the state court's adjudication of Petitioner's claims involved an unreasonable application of clearly established federal law, nor do the state court's findings result in a decision that is based upon an unreasonable determination of the facts in light of the evidence

---

[8] Even if these statements were biased, the petitioner has failed to show how they were so prejudicial as to render his trial fundamentally unfair.

presented in the state court proceedings. The petitioner has simply failed to show that the trial judge was biased or that his decisions had a negative impact on the jury's decision-making.

## C. Ground Three - Prosecutor Misconduct

In this ground, the petitioner asserts that his right to a fair trial was violated by several instances of prosecutorial misconduct. They are:

(1) destruction of exculpatory evidence;

(2) suppression of exculpatory evidence;

(3) suppression of false testimony;

(4) providing false information to the defense attorney and denying the defense discovery items that had been granted by the court;

(5) failure to disseminate the court ordered discovery order of a list of individuals with whom the child had discussed the alleged sexual abuse;

(6) failure to make any attempt to secure the court ordered discovery request for the billing of the first 15 sessions between the child and her psychologist;

(7) improper opening and closing remarks; and

(8) improper questioning of state witnesses.

In order to establish prosecutorial misconduct, the petitioner must show that the prosecutor's conduct was so egregious as to render his trial fundamentally unfair. United States v. Young, 470 U.S. 1, 11-12 (1985). Moreover, in Brady v. Maryland, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is material "if there is a

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985); United States v. Cole, 293 F. 3d 153 (4th Cir.), cert. denied, 123 S.Ct. 387 (2002).

The state habeas court did not specifically address these grounds in denying the petitioner's state habeas petition. This Court can only assume then, that the state court denied these grounds for the same reason that it denied the petitioner's claims of judicial bias -- petitioner is attempting to re-litigate the factual and legal findings made by the trial court. However, in these grounds, unlike the petitioner's claims of judicial bias, the petitioner raises specific instances of alleged prosecutorial misconduct that require more than a cursory dismissal. Because the state habeas court failed to specifically address these issues, the undersigned is unable to determine whether the state court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established Federal law. Therefore, these issues must be given a fresh review on the merits.

### Destruction/Suppression of Exculpatory Evidence/Suppression of False Testimony

With regard to these issues, the petitioner asserts the prosecution withheld Detective James' notes of her interview with G.V., even though the Court had ordered that such notes be turned over during discovery. In addition, the petitioner asserts that the prosecutor had to know that Detective James testimony was false during the grand jury proceedings, but failed to correct that testimony.

First, as to Detective James' notes, the testimony at trial and during the omnibus evidentiary hearing was that Detective James laid her notes on her desk after typing her official report. Resp. Ex. 38 at 324. Those notes were then misplaced on the detective's desk. Id. at 324-25. Just prior to her testifying at the petitioner's first trial in April 2000, Detective James was looking for another document and discovered the misplaced notes. Id. at 327-28. Detective James apparently did not

contact the prosecutor's office after her discovery, but instead, simply brought the missing notes to the petitioner's first trial on the day she was scheduled to testify. Id. at 323. Accordingly, any failure to provide the notes to the defense in violation of the discovery order was not the fault of the prosecution. Detective James' notes were lost and she was not aware that they had not been turned over to the prosecution with the rest of the file. The prosecution, in turn, believed that it had all of Detective James' notes and had turned over all pertinent discovery to the defense. The prosecution could not have withheld evidence that it did not know existed and did not have. Thus, there was no prosecutorial misconduct.

In addition, Detective James' notes were turned over to the defense at the start of the petitioner's April 2000 trial. That trial ended in a mistrial and the petitioner was not retried until some five months later. Thus, the defense had ample time to review the detective notes prior to her testimony at the petitioner's retrial and he cannot show prejudice for the previous failure to disclose the notes.

Second, as to Detective James grand jury testimony, as noted in Ground One above, Detective James testimony at the Grand Jury Hearing was not perjurious. Thus, the prosecution did not act inappropriately with regard to that testimony.

Third, as to the suppression of false testimony, the petitioner again asserts that at trial and at sentencing, the prosecution should have corrected Detective James' false testimony to the grand jury. Once again, however, the prosecution did not act inappropriately in either of these instances as it has already been established that Detective James testimony was not perjurious.[9]

---

[9] With regard to the petitioner's claim that this information was improperly withheld as it was exculpatory, the undersigned has reviewed the information allegedly withheld or destroyed and fails to see how that evidence is exculpatory. While there may be some inconsistencies that could have been

21

**Issues Related to Discovery**

With respect to these issues, the petitioner argues that the prosecution failed to turn over all evidence it was required to turn over pursuant to the trial court's discovery order. Specifically, the petitioner asserts that the prosecution failed to turn over notes of Ms. McMillen's sessions with G.V., a list of individuals with whom G.V. had discussed the alleged sexual abuse, and a billing statement from Ms. McMillen of her first 15 sessions with G.V.

First, there is no constitutional right to discovery. See <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977). The prosecution is only required to turn over exculpatory evidence or evidence which could be used for impeachment purposes. See <u>Brady v. Maryland</u>, 373 U.S. at 87. Therefore, matters of discovery are generally left to the state courts.

As to the petitioner's specific claims, the petitioner has provided no evidence to support his claims that the prosecution improperly withheld any discovery item. In addition, although the petitioner asserts that such evidence was exculpatory, he fails to support this assertion with any concrete evidence. Ms. McMillen used the notes of her sessions to produce her typewritten reports. Thus, so long as the petitioner received those reports, which he did, he had substantially the same information that would have been in Ms. McMillen's notes. In addition, it would have been nearly impossible to create a list of people with whom G.V. may have discussed the alleged sexual abuse. The testimony at trial was that after being placed in foster care, G.V. was moved through at least two foster homes. In addition, she discussed the alleged sexual abuse with her mother, father, siblings, possibly the petitioner, the police, caseworkers at DHHR, various persons with foster care services,

---

used for impeachment purposes, none of the evidence the petitioner points to actually establishes his innocence.

psychologists, and members of her foster families. In addition, Ms. McMillen testified at trial that G.V. was discussing the sexual abuse with other children and that they had to have discussions about boundaries and who would be appropriate persons with whom to discuss the sexual abuse. Resp. Ex. 38 at 126. Those people that the petitioner was most concerned about, *i.e.,* those persons who could have coached her, were already known to the petitioner. In addition, petitioner did receive from Ms. McMillen a list of the dates on which she saw G.V., although Ms. McMillen did not specifically create a billing list of G.V.'s sessions. However, the petitioner has failed to show how such information would have been exculpatory or used for impeachment purposes. At trial, the petitioner raised the issue of the amount of money Ms. McMillen received from the state for seeing children upon referral from the State. Ms. McMillen testified that such cases were a small part of her practice and that her private practice was much more lucrative. Id. at 481-21.

However, even assuming that this information should have been turned over to the defense, the petitioner has failed to show how the failure to do so prejudiced the defense or would have changed the outcome of the proceedings. As already noted, the petitioner has failed to show that this information was exculpatory. Moreover, the petitioner has failed to show how any of this information, generated by third parties, was withheld by the prosecution. Even assuming some error on the part of the prosecution, the plaintiff has simply failed to show how these issues rise to the level of a constitutional violation.

### Improper Opening and Closing Remarks

With respect to these claims, the petitioner asserts that there were 21 incidences of improper opening and closing remarks. The petitioner's claims range from statements declaring the petitioner guilty to inflammatory comments offered for no other purpose than to incite the jury. The petitioner

also asserts that the prosecutor offered her own personal opinion of the credibility of the state's witnesses and introduced facts not on the record.

For the sake of brevity, the undersigned will not list all 21 incidences that the petitioner cites in his opinion. Nevertheless, the undersigned has reviewed each and every incident cited by the petitioner and fails to see how any of those remarks were improper. It is a fundamental principal of law that opening and closing statements are not testimony and the jury should not regard them as such. The jury in this case was so instructed numerous times. See United States v. Coleman, 7 F.3d 1500, 1506 (10th Cir. 1993) ("[a] principal tenet of jurisprudence is that jurors are presumed to follow the law"). What the petitioner really asserts is that the prosecution should not have tried to convince the jury that its evidence showed that he was guilty of the crime for which he was charged. That, however, is the very purpose of opening and closing arguments. During the state's opening remarks, the prosecutor told the jury what she intended to prove. During closing arguments, the prosecutor told the jury what she thought the evidence proved. Having reviewed the entire transcripts of the trial, and specifically in this case, the prosecutor's opening and closing remarks, the Court can find no statements or actions on the part of the prosecution that were so improper that this court would not have confidence in the outcome of the proceedings. Any improper remarks were inconsequential and did not render the petitioner's trial fundamentally unfair.

### Improper Questioning of State Witnesses

With respect to this issue, the petitioner asserts that the prosecutor improperly questioned Ms. McMillen about G.V.'s "healing process." The petitioner asserts that this line of questioning was reversible error because it amounted to the counselor testifying that the alleged victim was telling the truth and because she was an expert, persuaded the jury to find the child credible. The petitioner

asserts that by talking about G.V.'s healing, it suggested that the petitioner was guilty.

In looking at the specific exchange that took place between the prosecution and the witness, the undersigned does not believe that this line of questioning was improper. See Resp. Ex. 38 at 135-137. Ms. McMillen brought up the issue of G.V.'s healing process. Id. at 135. The prosecution simply followed through with a few questions about what the healing process entailed. Id. at 136-137. The entire exchange encompasses less than two pages in the transcripts, even though Ms. McMillen's testimony for the State lasted for 30 pages. Id. at 107-137. The Court is unable to see how such questioning rendered his trial fundamentally unfair.

There was not really any dispute at trial as to whether G.V. was actually sexually abused. In fact, all the testimony appeared to show that she was. The issue for the jury to resolve was whether or not the petitioner was the perpetrator of the sexual abuse. The jury clearly found that he was. The petitioner cross-examined the witnesses extensively about improper methodology and coaching. In addition, the petitioner presented evidence that G.V. had seen, or had likely seen him naked, thereby enabling her to give a description of his genitalia. The petitioner also testified that he did not sexually abuse G.V. The jury obviously thought otherwise. Thus, even if those few questions about G.V.'s healing process were improper, the undersigned fails to see how such questions prejudiced the defendant to such an extent that his trial was fundamentally unfair.

**D. Ground Four - Ineffective Assistance of Counsel**

With regard to ineffective assistance of counsel claims, counsel's conduct is measured under the two part analysis outlined in Strickland v. Washington, 466 U.S. 668, 687 (1984). First, a petitioner must show that counsel's performance fell below an objective standard of reasonableness. Id. at 688. In reviewing the reasonableness of counsel's performance, "judicial scrutiny must be

25

highly deferential." Id. at 689-90. Second, if the Court finds that counsel's performance was unreasonable, the petitioner must then demonstrate that he was prejudiced. In order to demonstrate prejudice, "the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a one that is "sufficient to undermine confidence in the outcome." Id.

### Trial Counsel

In support of this claim, the petitioner asserts the following instances of ineffective assistance of trial counsel:

(1) the lack of preparation time sufficient to take the case to trial caused the following instances of ineffectiveness:

> (a) failure to properly examine and/or cross examine witnesses;

> (b) failure to prepare the defendant for trial;

> (c) failure to familiarize himself with the specific type of case he agreed to defend and with the specific scientific area to which the State's experts would be testifying;

> (d) failure to conduct a reasonable investigation of petitioner's case, in particular, the petitioner's claim of innocence;

> (e) failure to subpoena defense witnesses;[10]

> (f) failure to use prior inconsistent statements by the State's witnesses for impeachment purposes;

---

[10] The petitioner lists this claim as (f) in his petition, however, the undersigned can find no claim labeled (e). See Petition at 65-69. Therefore, the undersigned has changed the petitioner's identification of this, and all subsequent grounds in this section of the petition, to reflect the sequential order of the claims as raised therein.

(g) cumulative error; and

(h) external interference.

(2) Cumulative error.

(3) External Interference.

(4) Failing to object to the prosecutor's improper remarks during opening and closing statements.[11]

(5) Failing to challenge clearly erroneous jury instructions.[12]

With regard to counsel's lack of preparation time, the state court found that trial counsel's performance was not deficient and that even if it was, the results of the proceedings would not have been different. Resp. Ex. 12 at 14. The state habeas court further noted that petitioner's trial counsel had testified at the omnibus evidentiary hearing that he adequately investigated the case, that he was able to utilize Mr. Shough's preparation for trial, and that the petitioner had failed to provide any competent evidence to the contrary. Id. The state habeas court also found that the petitioner's claim that trial counsel failed to investigate his claim of innocence was unfounded and that petitioner's trial counsel formulated a credible and practical plan of attacking the state's evidence. Id.

Upon an independent review of the record, the undersigned finds that the state court's adjudication of the petitioner's claims of ineffective assistance of trial counsel was not contrary to clearly established federal law. The state habeas court properly cited and utilized the test set forth in Strickland to evaluate the petitioner's claims of ineffectiveness. See Resp. Ex. 12 at 12-13.

---

[11] This issue was addressed in ground three above. Being that the prosecutor's remarks were not improper, counsel could not have been deficient for failing to object.

[12] This issue is addressed in more detail in ground six. Being that the Court can find no error in the reading of the jury instructions, counsel could not have been deficient for failing to object.

Additionally, in light of the evidence presented in the state court proceedings, the undersigned does not believe that the state court's adjudication of the petitioner's claims involved an unreasonable application of clearly established federal law, nor do the state court's findings result in a decision that is based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

At the second omnibus evidentiary hearing, petitioner's trial counsel testified that although he would have liked more time to prepare the petitioner's case, at the time of trial he was fully prepared and ready to proceed. Resp. Ex. 41 at 13. More specifically, Petitioner's trial counsel testified that he had formulated a defense strategy and was prepared to question witnesses.[13] Id. at 13-14. In addition, Petitioner's trial counsel stated that he had the benefit of Mr. Shough's trial preparation from the April 2000 mistrial. Id. at 17. As noted by the state habeas court, other than his own self-serving and conclusory allegations, the petitioner has failed to provide the Court with any evidence that counsel's performance fell below an objective standard of reasonableness or that even if it did, the results of the proceedings would have been different.[14]

---

[13] To the extent that the petitioner argues that trial counsel failed to investigate his claims of innocence, the undersigned finds no merit to this argument. The only basis for the petitioner's claim of innocence was his own belief that he did not commit the crime. Therefore, there was nothing for counsel to investigate. To the extent that the petitioner argues that counsel could have proven his innocence by questioning the methodology of the psychologist and social workers who questioned the victim, or by showing that there was ample opportunity for the child to be coached, that is exactly the strategy that was employed at trial. A review of the trial transcripts shows that both the petitioner and his trial counsel raised these issues with the various witnesses. Obviously, the jury did not believe that the child was improperly questioned or that she was coached. The fact that this defense strategy did not work does not necessarily render counsel's representation either ineffective or unreasonable. Given the circumstances, petitioner's trial counsel did the best he could, and in fact, his representation of petitioner was admirable.

[14] See ground thirteen, infra, for a discussion on the evidence against the petitioner at trial.

**Appellate Counsel**

In support of this claim, the petitioner asserts the following instances of ineffective assistance of appellate counsel:

(1) Counsel failed to raise the following issues on direct appeal:

      (a) trial court's lack of jurisdiction as a result of a defective indictment;

      (b) misconduct on the part of the trial court;

      (c) misconduct on the part of the Marion County Prosecutor's Office;

      (d) prosecution's violation of court granted discovery order and withholding of exculpatory evidence;

      (e) defective jury instructions;

      (f) highly improper, false, prejudicial, and inflammatory remarks made by the prosecution during both the opening and closing arguments;

      (g) violation of right to confrontation; and

      (h) failure of defense counsel to move for mistrial or dismiss the indictment because of the State's failure to produce the alleged medical verification testified to during the grand jury proceedings.

In ground three, the petitioner contends that appellate counsel was ineffective for failing to raise certain issues on appeal. The standard for reviewing a claim of ineffectiveness assistance of appellate counsel is the same as when reviewing the effectiveness of trial counsel. See Smith v. State of South Carolina, 882 F.2d 895 (4th Cir. 1989), cert. denied, 493 U.S. 1046 (1990). In reviewing the performance of appellate counsel, the court "must accord appellate counsel the 'presumption that he decided which issues were most likely to afford relief on appeal.'" Bell v.

Jarvis, 236 F.3d at 164 (quoting Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993)). Moreover, the Sixth Amendment does not require that appellate counsel raise every nonfrivolous issue on appeal. In fact, the Supreme Court has recognized the importance of "having the appellate advocate examine the record with a view to selecting the most promising issues for review." Jones v. Barnes, 463 U.S. 745, 752 (1983).

Each of the issues raised by the petitioner in this ground have been, or will be, addressed on the merits in this opinion. Moreover, the undersigned has found that the underlying argument for each of these issues is without merit. Therefore, the petitioner cannot show that he was prejudiced by appellate counsel's failure to raise any of these issues on direct appeal.

**E. Ground Five - Denial of Discovery/Withholding of Exculpatory Evidence**

In this ground, the petitioner asserts that his right to a fair trial was violated when the prosecutor failed to abide by a court granted discovery order to turn over several materially relevant pieces of discovery to the defense. Specifically, the petitioner asserts that the prosecutor failed to turn over the grand jury minutes, the detective's interview notes, the psychologist's notes, Rebekah Bledsoe's notes, an accounting of individuals who had the opportunity to have discussions with the child about the alleged sexual abuse, the psychologist's billing of the first 15 sessions with the child, the audio tape recording of the interview with the petition and the police detective on January 5, 1999, and all medical and psychological records of the child related to the alleged abuse.

These issues were addressed in detail in ground three above. As already found, the prosecution did not fail to abide by a court granted discovery order, nor was this information exculpatory. Thus, the petitioner has failed to show that his right to a fair trial was violated on this basis.

## F. Ground Six - Defective Jury Instructions

In this ground, the petitioner asserts that his right to a fair trial was violated as a result of the trial court's inappropriate presentation of the instructions to the jury. More specifically, the petitioner asserts that the trial judge "speed-read" the jury instructions which could signify to the jury that the instructions were not important.

The Court finds no merit to this argument. At the petitioner's second omnibus evidentiary, the only testimony regarding the trial court's presentation of the jury instructions was the testimony of petitioner's trial counsel, Eric Wildman. At that hearing, Mr. Wildman testified as follows:

> **Defendant Lucas:** Okay. Referring back to the trial, do you recall the reading of the jury instructions, the 16 plus pages that Judge Merrifield read to the jury?
> **A.** Yes, I know he read the jury instructions.
> **Defendant Lucas:** You don't know what they were but you recall he read the jury instructions?
> **A.** Yes, sir.
> **Defendant Lucas:** In your experience as a criminal lawyer, is it standard practice for jury instructions to be speed read to the jury . . .
> **A.** I don't recall them being speed read but they were probably read in haste given the volume . . .
> **Defendant Lucas:** Let me ask you this, Mr. Wildman, if you had still been my attorney, instead of acting as a legal advisor, would you have objected to the rapid reading of the jury instructions?
> **A.** Mr. Lucas, it doesn't stand out to me that there was, at this point in time. Of course, it has been a while now, but it didn't stand out to me at the time, I guess, that there was anything inappropriate about the reading of the jury instructions. Now, I can't answer that question because I don't recall.
> **Mr. Lucas:** Okay. You didn't notice anything at all irregular about the jury instructions, is that what your testimony is?
> **A.** My testimony is, sitting here today, I don't recall back during the time of this trial, I don't recall that, no.

Resp. Ex. 41 at 26-28.

Moreover, the trial transcripts show that even if read in haste,[15] the jury was given copies of the instructions to follow along with the trial judge as he read. Resp. Ex. 38 at 531. In addition, the trial transcripts also show that the jury was permitted to take copies of the jury instructions into the jury room during deliberations. Id. at 548. The petitioner has simply presented no evidence that the jury instructions were improperly presented to the jury, or that if they were, he suffered any prejudice as a result.[16]

## G. Ground Seven - Improper Opening and Closing Remarks

In this ground, the petitioner asserts that he was deprived of his right to a fair and impartial trial as a result of prejudicial, false, inflammatory, misleading, and/or inappropriate comments made by the prosecutor during opening and closing arguments. With regard to the prosecutor's opening remarks, the petitioner asserts that the prosecutor stated that she intended to show certain things were done or said in this case that would show the defendant's guilt. However, the petitioner complains that some of those things were never shown at trial. With regard to the prosecutor's closing statements, the petitioner objects to the fact that the prosecutor did not preface her comments with

_____

[15] The testimony at the petitioner's second omnibus evidentiary hearing was that the jury instructions were 16 pages long. The petitioner asserts that he timed the court's reading of the instructions and found that it took the trial judge approximately 13 minutes to read the instructions. The petitioner does not, however, introduce evidence of font size, line spacing, or other factors which would tend to show whether 13 minutes was enough time to adequately present 16 pages of instructions to the jury. Thus, the undersigned is not convinced that reading 16 pages in 13 minutes constitutes "speed reading."

[16] The petitioner's self-serving suppositions as to the possible consequences of reading the jury instructions in haste -- that the jury would get the impression that the jury instruction were of no consequence or were not important -- is insufficient to state a claim. See Blackledge v. Allison, supra ("notice pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error"); Nickerson v. Lee, supra (unsupported, conclusory allegations do not entitle a habeas petitioner to relief, a habeas petitioner must come forth with evidence that a claim has merit). The petitioner cannot know what effect, if any, the alleged "speed-reading" of the jury instructions had on the jurors.

"the evidence shows," that the prosecutor gave false instructions on the law, and that the prosecutor attempted to bolster the credibility of the State's witnesses.

This issue was addressed in detail in ground three above. As already found, the prosecution's remarks during opening and closing statements were neither improper nor prejudicial. Thus, the petitioner has failed to show that his right to a fair trial was violated on this basis.

## H. Ground Eight - Right to Confront All Witnesses

In this ground, the petitioner asserts that his right to confront all witnesses against him was violated when the alleged child victim was positioned during her testimony so that she was unable to view the petitioner and he was unable to view her. However, the petitioner asserts that the child testified that she was not afraid of him and that she did not hate him. The petitioner also argues that such positioning suggested to the jury that the child would be traumatized by having to face the petitioner and therefore, was unduly prejudicial. The petitioner also asserts that it was prejudicial to allow the child's foster mother to sit beside her on the stand and hold her hand while testifying. The petitioner asserts that this arrangement, whether intentional or not, enlisted unwarranted sympathy from the jury members.

"The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990).[17] One way to ensure the reliability of the evidence against a criminal defendant is through face-to-face confrontation. Id. at

---

[17] In Craig, the child witness was permitted to testify via close-circuit television. The witness, the prosecutor, and defense counsel, withdrew to a separate room while the defendant remained in the courtroom with the judge and jury. A video monitor recorded and displayed the child's testimony to those in the courtroom. During this testimony, the child could not see the defendant and the defendant remained in contact with his counsel only through electronic communication.

846. Face-to-face confrontation reduces the risk that "a witness will wrongfully implicate an innocent person." Id. However, although face-to-face confrontation "forms the core of the values furthered by the Confrontation Clause, we (the Supreme Court) have nevertheless recognized that it is not the *sine qua non* of the confrontation right." Id. at 847 (internal quotations and citations omitted). Therefore, "the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose testimonial infirmities [such as forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." Id. (quoting Delaware v. Fensterer, 474 U.S. 15, 22 (1985)).

In this case, the child was present in the courtroom and the defense was given the opportunity to fully cross-examine her. The petitioner's confrontation rights do not necessarily include the right to look the witness in the eye during her testimony. Accordingly, the fact that the witness was positioned so that she did not have to look directly at the petitioner does not in and of itself establish a violation of the confrontation clause. As noted by the respondent, the child still had to "walk into the same courtroom, see() the Petitioner sitting at counsel table, [testify] and [be] subject to cross-examination, knowing the Petitioner was only a few feet away from her." Dckt. 31 at 53.

In addition, the petitioner's claim regarding the foster mother is equally without merit. Prior to the child testifying, the trial judge informed the jury of the following:

> **The Court**: Ladies and Gentlemen, let me indicate to you, it's been my common practice, when infants testify, is (sic) to have a guardian or someone sit with the infant to sort of lessen the fact that they are in court. Sometimes children are terrified by being in court and I think it lessens the effect of the courtroom setting if someone sits beside the child.
> I do it in every case. Nothing special in this case. It's just to allow the child to testify honestly and truthfully as to what may have happened.

Resp. Ex. 38 at 86.

34

Clearly, the jury was informed of the reason for allowing the foster mother to sit next to the child during her testimony. Moreover, the jury was informed that such an arrangement is the common practice of the court and that it is done in every instance when a child testifies. The trial judge explained that there was nothing special about this case. Therefore, the jury was fully aware that the reason for the mother sitting next to the child during her testimony was innocuous and that they should not attach any special value to that action. See United States v. Coleman, supra. Accordingly, allowing the foster mother to sit next to the child during her testimony was not prejudicial to the petitioner so as to render the proceedings against him fundamentally unfair.

## I. Ground Nine - Lessor Included Offense Instruction

In this ground, the petitioner asserts that his right to a fair trial was violated when the trial court refused to give the defendant's requested instructions for third degree sexual abuse.

This ground is refuted by the record. Assuming that third degree sexual abuse is a lessor include offense for a charge of first degree sexual assault, the failure of the trial court to give this instruction did not adversely affect the trial proceedings. The record shows that the trial court did give the jury a lessor included instruction on First Degree Sexual Abuse. However, the jury found the petitioner guilty of the highest possible offense for which he was charged -- First Degree Sexual Assault. Thus, even assuming that the trial court erred by not giving the jury instruction on other possible lessor included offenses, the petitioner suffered no prejudice.

## J. Ground Ten - Violation of Rule of Evidence 404(b)

In this ground, the petitioner asserts that his right to a fair trial was violated when the trial court admitted evidence of prior wrongful acts pursuant to Rule 404(b) of the West Virginia Rules of Evidence.

Whether evidence of prior bad acts was properly admitted under West Virginia law is an issue of state law. Therefore, ground ten is not cognizable on federal habeas review and should be dismissed. See 28 U.S.C. § 2254(a) ("a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or law or treatises of the United States")(emphasis added); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (it is not the province of a federal habeas court to "reexamine state-court determinations on state-law questions"); Weeks v. Angelone, 176 F.3d 249, 262 (4th Cir. 1999) (questions of state laws and statutes are not cognizable on federal habeas review).

## K. Ground Eleven - Refusal to Grant Continuance

In this ground, the petitioner asserts that his due process rights were violated when the trial court refused to grant a continuance. The petitioner acknowledges that under normal circumstances, such a decision is within the sound discretion of the trial court. Petition at 127. However, the petitioner asserts that the court's refusal to continue his case was a spiteful action taken by the court to punish him for insisting that his first court appointed attorney be replaced. Id.

With respect to this claim, the state habeas court found that under West Virginia law, "[t]he factors relevant in assessing claims of inadequate time to prepare for trial are: the time available for preparation, the likelihood of prejudice from the denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, the availability of discovery from the prosecution, the adequacy of the defense provided at trial, the skill and experience of the attorney, any pre-appointment or pre-retention experience of the attorney with the accused for the alleged crime, any representation of the defendant by other attorneys that accrues to his benefit, whether the

plea for more time to prepare for trial is made in good faith, the public interest in a speedy trial of the case, and the time the defendant has been in prison awaiting trial." Resp. Ex. 12 at 11 (citing Syl. Pt. 2, State v. Angel, 173 W.Va. 620, 319 S.E.2d 388 (1989), (quoting Syl. Pt. 4, State v. Bush, 163 W.Va. 168, 255 S.E.2d 539 (1979)). Applying these factors to the case at hand, the state habeas court found that the petitioner was not prejudiced by the trial court's refusal to grant a continuance. Id. at 12.

As noted by the petitioner, the decision as to whether or not to grant a continuance is a matter within the sound discretion of the trial court. It appears in this instance that the trial court considered the petitioner's motion under the proper standard set forth by the State of West Virginia. Thus, to the extent that this Court can review this claim on federal habeas review,[18] the trial court did not abuse its discretion or violate the petitioner's due process rights.[19]

## L. Ground Twelve - Denial of Expert Assistance

In this ground, the petitioner asserts that the trial court erred when it denied his request for an expert witness to determine whether or not the caseworker at DHHR employed incorrect methodology in examining and interviewing the alleged child victim.

Pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), judges are assigned a significant gatekeeping role over scientific evidence. Under West Virginia law, when examining scientific evidence, the court must first determine "whether the testimony reflects

---

[18] Estelle v. McGuire, supra (it is not the province of a federal habeas court to "reexamine state-court determinations on state-law questions"); Weeks v. Angelone, supra (questions of state laws and statutes are not cognizable on federal habeas review). In this ground, the petitioner is again simply trying to re-litigate the legal rulings made by the trial court.

[19] The trial court applied the very test recognized by the state habeas corpus as the appropriate test for considering a motion for continuance. See Resp. Ex.37 at 6-10.

scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good science." Syl. Pt. 4, Gentry v. Mangum, 195 W.Va. 512, 466 S.E.2d 171 (1995). Second, the court must "ensure that the scientific testimony is relevant to the task at hand." Id. Moreover, when challenging the trial court's refusal to appoint an expert, the petitioner must offer "more than undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472 U.S. 320, 323 n. 1 (1985).

In this case, the trial court clearly assessed the petitioner's request for an expert witness under the appropriate standard of review. See Resp. Ex. 17 at 5. In addition, the petitioner argues nothing more than his undeveloped assertion that an expert witness would have been beneficial. Such a general statement is clearly not sufficient to find that the trial court's failure to appoint an expert was a violation of due process. See Caldwell, supra.

## M.  Ground Thirteen - Verdict Unsupported by the Evidence

In this ground, the petitioner asserts that his right to due process and right to a fair trial were violated when the jury returned a verdict of guilty that is unsupported by even circumstantial evidence.

When reviewing a claim of the sufficiency of the evidence in federal habeas review, the district court is required to view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

At trial, the prosecution had to prove that the petitioner, being more than 14 years old, engaged in either sexual intercourse or sexual intrusion with G.V., who was eleven years old or less. Resp. Ex. 38 (Trial Transcripts) at 538. There is no dispute that at the time of the alleged incidents,

the petitioner was more than 14 years old and that G.V. was less than eleven.[20] Therefore, the only factor for the jury to determine was whether or not the petitioner engaged in sexual intercourse or sexual intrusion with G.V. In the court's instructions to the jury, sexual intercourse was defined as "any act between persons not married to each other involving penetration, however slight, of the female sex organ by the male sex organ or involving contact between the sex organs of one person and the mouth or anus of another person." Id. at 538. In addition, sexual intrusion was defined as "any act between persons not married to each other involving penetration, however slight, of the female sex organ or the anus of any person by an object for the purpose of degrading or humiliating the person so penetrated or for gratifying the sexual desire of either party." Id.

At trial, G.V. testified that the petitioner "touched his privates with mine" when they lived in the green house and the white house. Id. at 92. G.V. then identified her privates by pointing to her vaginal area. Id. at 94. G.V. also testified that when the petitioner rubbed his private parts on her private parts that a "gray thing" came out of the petitioner's private parts.[21] Id. G.V. further testified that a "bad touch" is when one someone rubs his or her privates on someone else and that a "secret touch" is when somebody gives you a bad touch and then says not to tell. Id. at 97-98. Finally, G.V. testified that the petitioner gave her "secret touches." Id. at 99.

Supplemental to the testimony of G.V. was the testimony of her DHHR caseworker, Rebekah

---

[20] The two alleged instances of sexual abuse took place sometime between December 1, 1997 through July 31, 1998, and July 1, 1998 through January 4, 1999. Resp. Ex. 1 (Grand Jury Charges). At trial, the petitioner testified that he was born in 1937, making him approximately 60 or 61 years old at the time of the alleged events. Resp.Ex. 38 at 495-96. In addition, G.V. testified that she was seven years old at the time of the trial in September 2000, making her approximately 4 or 5 years old at the time of the alleged events. Id. at 87.

[21] It is not clear what G.V. meant when she said "gray thing." It appears that Detective James interpreted this to mean an uncircumcised penis, but G.V.'s psychologist later determined this to mean semen.

Bledsoe and psychologist, Sharon McMillen. Ms. Bledsoe testified that during her initial interview with G.V., the child stated that "her daddy had taken his pants off and her pants off and rolled around on the bed with her." Id. at 260. (G.V. called the petitioner Daddy even though he was not her biological father.) Ms. Bledsoe also testified that during this interview, G.V. gave contextual details such as the color and look of the petitioner's penis and that "gooky skin" came out that smelled funny. Id. at 261. Ms. Bledsoe also testified that G.V. told her that the petitioner "didn't put it in her hole, but rubbed it on her privates" and that he "asked her to hold his privates." Id.

Ms. McMillen testified that G.V. and her siblings were referred to her practice by Burlington Family Foster Care Services. Id. at 118. Ms. McMillen further testified that she was contacted for joint services related to the children's adjustment to foster care as well as individual services for special issues they were having separately. Id. at 119. As to G.V., Ms. McMillen testified that one of the special issues was alleged sexual abuse, but that at the time G.V. was brought in, Ms. McMillen was not aware of the details of that abuse. Id. Ms. McMillen did later receive some documentation as to the specific allegations of sexual abuse, but that was several months after she started seeing G.V. Id.

At her counseling sessions, Ms. McMillen testified that G.V. expressed sexualized behavior that was inappropriate for children her age. Id. at 120. For example, G.V. allegedly showed a clingyness to men and wanted a lot of attention from men, including putting herself on display in front of men. Id. Ms. McMillen also testified that G.V. used a lot of sexualized talk that was inappropriate for her age group. Id. at 121. Ms. McMillen also testified to and brought in a graphic picture that G.V. drew depicting a penis. Id. at 131. Ms. McMillen testified that she labeled the drawing with the words G.V. used to describe the picture. Id. The drawing shows what the penis

looked like, where the man's body was in relation to it, the color of the penis, marks on the penis, the way the skin looked and that "light grey stuff" came out the tip. Id.; Resp. Ex. 18 (drawing). Significantly, Ms. McMillen testified that G.V. consistently and exclusively identified only the petitioner as the person who did the "bad touching." Id. at 133.

Ms. McMillen then testified that G.V. never recanted her accusations, and in fact, the longer she was in therapy, and the longer she knew she was safe, G.V. actually opened up more and provided more details. Id. at 134. Ms. McMillen also testified that as G.V. opened up more, the core details always stayed the same and that there were never any major inconsistencies. Id. Additionally, during the petitioner's case in chief, when he recalled Ms. McMillen to the stand, she later testified with certainty that G.V. had been sexually abused. Id. at 438. Moreover, the petitioner himself, elicited testimony that the child had told Ms. McMillen that he had "stuck his thumb in her butt." Id. at 449.

Based on this testimony alone, it is clear that there is sufficient evidence to support the jury's finding of guilt on the charge of First Degree Sexual Assault. The key issues in this case were whether or not the jury believed that G.V. had been sexually assaulted and whether or not the petitioner was the perpetrator of that act. The issues raised by the petitioner in his petition to support his claim that there is insufficient evidence to support his conviction are all related to the credibility of the witnesses and the weighing of evidence. Those are issues that were resolved by the jury at trial and are not within the province of federal habeas review. See Johnson v. Alabama, 256 F.3d 1156, 1172 (11th Cir. 2001) ("When the record reflects facts that support conflicting inferences, there is a presumption that the jury resolved those conflicts in favor of the prosecution and against the defendant. In other words, federal courts must defer to the judgment of the jury in assigning

41

credibility to the witnesses and in weighing the evidence."). Accordingly, the petitioner's Ground Thirteen is without merit.

## IV. The Circuit Court's Alleged Lack of Definitive Findings of Fact and Conclusions of Law

W.Va.Code §53-4A-7(c) requires a West Virginia court denying a request for habeas relief to enter a written order, "mak[ing] specific findings of fact and conclusions of law relating to each contention or contentions and grounds (in fact or law) advanced . . . clearly stat[ing] the grounds upon which the matter was determined, and . . . stat[ing] whether a federal and/or state right was presented and decided."

Open a review of the circuit court's Order denying petitioner state habeas relief, the undersigned finds that the court clearly fulfilled its statutory obligation in this regard. In the Final Order Denying Petition for Writ of Habeas Corpus, the circuit court outlined the labyrinthine facts and procedural history of this case, explained the grounds and claims advanced by the petitioner, stated the grounds upon which each was determined, and on which its determinations were made. However, even assuming *arguendo* that the memorandum opinion and order varied slightly from the norm, based upon a strict reading of the code provision, this Court finds that any minor discrepancy associated therewith does not rise to the level of a constitutional violation. See Estelle v. McGuire, supra.

## V. Recommendation

For the reasons set forth in this Opinion, it is recommended that the respondent's Motion to Dismiss (dckt. 30) and Motion for Summary Judgment (dckt. 32) be **GRANTED** and the petitioner's § 2254 petition be **DENIED** and **DISMISSED WITH PREJUDICE**. In light of these findings, it is further recommended that the petitioner's request for an investigator, contained within his

objections to the State's dispositive motions (dckt. 45), be **DENIED** as **MOOT**.

Within ten (10) days after being served with a copy of this recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to mail a copy of this Opinion/Report and Recommendation to the *pro se* petitioner.

DATED: August 2, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE